# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

United States of America *ex rel.*
Mark Elliott,

                    Case No.: 1:10-cv-392

        Plaintiff,

    v.

                    Judge Michael R. Barrett

Brickman Group Ltd., LLC,

        Defendant.

## OPINION & ORDER

This matter is before the Court on Defendant Brickman Group Ltd., LLC's ("Brickman") Motion to Certify Interlocutory Appeal and Stay Proceedings (Doc. 26).[1] This motion requests an order permitting an immediate appeal of this Court's November 21, 2011, Order (Doc. 25) denying Brickman's Motion for Reconsideration, and the Court's August 25, 2011, Order (Doc. 20) denying Brickman's Motion to Dismiss. Brickman also moves for a stay of proceedings pending the outcome of any interlocutory appeal. Plaintiff Mark Elliott[2] filed a response in opposition (Doc. 27), and Defendant has filed a reply in support (Doc. 28).

This case is a civil action brought under the False Claims Act, 31 U.S.C. § 3729 et seq. The False Claims Act imposes liability on any person who presents a false or fraudulent claim for payment to the government. 31 U.S.C. § 3729(a)(1). It authorizes private individuals to bring civil actions in the government's name, referred to as qui tam

---

[1] All Court document citations are to Docket Entry numbers.

[2] The Court refers to Mr. Elliott as "Plaintiff" instead of "Relator" because the government has declined to intervene in this action.

actions, and for individuals to collect a portion of any amount recovered. 31 U.S.C. § 3730(b)(1); *see also U.S. ex rel. Summers v. LHC Group, Inc.*, 623 F.3d 287, 291 (6th Cir. 2010). Here, Plaintiff brings two counts against Defendant. Count one alleges violations of the False Claims Act, and count two alleges False Claims Act retaliation. (Doc. 13 ¶¶ 49–60.) Both counts survived Defendant's previously filed motion to dismiss (Doc. 20, 21, 30) and Defendant's more recently filed motion to reconsider (Doc. 25, 20, 21). This matter is ripe for review.

## I.    Background

The following facts are repeated verbatim from the Court's Order denying Defendant's motion to dismiss. (Doc. 20, 2–6.) They are included here solely for convenience sake.

> The following facts come from Plaintiff's Amended Complaint. Defendant disputes these facts, but as it concedes (Doc. 15, 2), the Court must accept them as true on this motion to dismiss, *see Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). Plaintiff Mark Elliott was an employee of Brickman from November 2004 until January 2010. (Doc. ¶ 10.) Brickman is a national commercial-landscaping firm that performs multimillion-dollar landscaping contracts with large real-estate firms, one of which is Duke Realty. Duke Realty, in turn, has a multimillion-dollar, real-estate building contract with the federal government. (Doc. 13 ¶ 11.)
>
> Mr. Elliott worked for Brickman as a branch manager and as a regional sales manager/business development associate. (Doc. 13 ¶ 14.) During the first two-and-a-half years Mr. Elliott worked for Brickman, he served directly under regional manager Mark Davis. At that time, Mr. Elliott was the branch manager of Brickman's Great Lakes Region. (Doc. 13 ¶ 15.) In that position, Mr. Elliott oversaw the operational, financial, and administrative activities of Brickman's landscape-maintenance branch. Brickman's largest client within Mr. Elliott's branch was Duke Realty. (Doc. 13 ¶ 17.)

Duke Realty is a publicly traded, commercial-real-estate firm.  It leases office, industrial, and retail properties to a wide array of private and governmental entities.  (Doc. 13 ¶ 18.)  Brickman handled all of Duke Realty's landscaping business in the Cincinnati, Ohio, area from 2001 onward. (Doc. 13 ¶¶ 19, 20.)

During the two-and-a-half years Mr. Elliott worked under Mark Davis, from November 2004 to the spring of 2007, Mr. Davis ordered Brickman employees not to perform or to perform at a reduced rate specific landscaping work it was contractually obligated to perform for Duke Realty.  This resulted in significant financial gains for Brickman.  This underperformed work included applying fertilizer and mulch, pruning, flower installations, and various other tasks typically associated with the landscaping business.  (Doc. 13 ¶ 21.)

Mr. Davis, as regional manager, also directed Brickman managers to delete specific line items within the estimates it had contractually agreed to perform for Duke Realty without Duke Realty's knowledge or authorization.  (Doc. 13, ¶ 22.) During one incident, Mr. Davis directed Mr. Elliott and others to remove over 4,000 hours of contractually obligated services from the Duke Realty estimates to meet certain profit margins, known as "budget directives," that Brickman's lead management set.  Plaintiff alleges that these budget directives were ordered by Jeff Herold, Brickman's chief operating officer.  (Doc. 13 ¶ 25.)  Despite these changes, which led to services either not being performed or being performed at reduced levels, the amount of services billed to Duke Realty was never changed.  (Doc. 13 ¶ 27.)  As the Amended Complaint states, "Duke Realty was never made aware of the deletion and reductions in services and, therefore, paid for services which were either not fulfilled or not completely fulfilled."  (Doc. 13 ¶ 28.)  Plaintiff further alleges that Brickman never displayed any intention of informing Duke Realty of these changes.  (Doc. 13 ¶ 28.) Plaintiff states that this deletion or reduction in services was repeated for each of the years Mr. Elliott worked under Mr. Davis.  (Doc. 13 ¶ 29.)

Plaintiff also claims that Mr. Davis manipulated "work orders," which were for work performed by Brickman in addition to the original contractual obligations it owed to its clients.  These work orders were allegedly manipulated to meet bottom-line profit margins.  (Doc. 13 ¶ 31.)  As a result, substantial amounts of landscaping materials were purchased for work to be done on Duke Realty properties,

3

but without Duke Realty's knowledge, unused materials were resold, resulting in large profits for Brickman. (Doc. 13 ¶ 32.)

Plaintiff also alleges that Brickman marked up bills for snow removal services and billed for unused snow removal materials. (Doc. 13 ¶ 33.) Mr. Elliott and other Brickman managers were repeatedly told that their bonuses relied on how much profit they could squeeze from clients' snow removal bills. As the Amended Complaint alleges, "they were instructed to 'use their thumbs' when billing for snow removal services." (Doc. 13 ¶ 34.) Plaintiff alleges that every year he worked under Mr. Davis, large quantities of salt were improperly added to Duke Realty's snow removal bills. Duke Realty would occasionally complain about these bills, and Defendant would accept reduced payments on these occasions, but Brickman's profit margin was still well above what would have otherwise resulted without the overbilling. (Doc. 13 ¶ 35.)

Duke Realty's largest tenant within the Cincinnati area was the General Services Administration ("GSA"), a federal agency that acts as the landlord for the federal government. (Doc. 13 ¶ 37.) When private companies, such as Duke Realty, lease property to the U.S. government, the actual lessee is the GSA. (Doc. 13 ¶ 38.) Plaintiff alleges that Brickman's inflated billing estimates were incorporated into bids Duke Realty made to the GSA and which the GSA ultimately accepted. As a result, Plaintiff alleges that because of its inflated estimates, Brickman has repeatedly defrauded the federal government. (Doc. 13 ¶ 42.) The federal properties in question include the Fort Campbell Military Base in Kentucky; the Bureau of Worker's Compensation at Governor's Hill in Mason, Ohio; the Fort Drum Army Base in New York; and several industrial sites leased by the Internal Revenue Service and co-run by Prologis and Brickman. Plaintiff's Amended Complaint also refers to a criminal investigation of this matter that has been referred to the Cincinnati Division of the Federal Bureau of Investigation. (Doc. 13 ¶ 43.)

In the spring of 2007, Brickman moved Mr. Elliott to a newly created job under the title of "Business Development Associate." Shortly thereafter, Mr. Elliott informed two Brickman divisional managers, Chris Hayes and Gary Kuykendall, of Brickman's allegedly fraudulent billing practices. (Doc. 13 ¶ 44.) These disclosures apparently prompted an investigation, but Mr. Elliott claims that no one at Brickman ever informed him of the progress of this

investigation or consulted him for additional information. (Doc. 13 ¶ 45.)

In the summer of 2009, Mr. Elliott was reassigned to again work under Mark Davis. In this new position, Mr. Elliott and Mr. Davis had numerous verbal arguments, which resulted in Mr. Davis stating that he knew of Mr. Elliott's reports to Mr. Hayes and Mr. Kuykendall. Mr. Davis allegedly threatened Plaintiff by telling him that he "would 'pay for that oversight' and that Plaintiff's 'days were counted.'" (Doc. 13 ¶ 46.)

In December 2009, Mr. Elliott approached Mr. Hayes and requested reassignment to a position away from Mr. Davis. Mr. Hayes allegedly told him that he would contact Plaintiff once he determined where he could be reassigned. However, Mr. Hayes never contacted Mr. Elliott again regarding his requested reassignment. (Doc. 13 ¶ 47.)

Mr. Elliott resigned "under duress" on January 21, 2010. (Doc. 13 ¶ 48.) He alleges that the duress came from Mr. Davis' verbal threats and a written reprimand issued by Mr. Davis on January 20, 2010. Plaintiff brought this suit against Brickman approximately six months later, on June 16, 2010. (Doc. 1.) The government was given the opportunity to intervene in this action, but it declined to do so. (Doc. 9.)

Count one of Plaintiff's Amended Complaint alleges violations of the False Claims Act, and count two alleges False Claims Act retaliation. (Doc. 13 ¶¶ 49–60.) More specifically, Plaintiff alleges that Brickman knowingly presented false or fraudulent claims for payment to the government and knowingly made false records relating to those claims. (Doc. 13 ¶ 51.) He further alleges that he resigned under duress after Brickman retaliated against him based on its belief that he would bring a qui tam action against Brickman. (Doc. 13 ¶ 57.) In other words, "Brickman forced Plaintiff's resignation in an effort to threaten, harass, and discriminate against him, in violation of 31 U.S.C. § 3730(h)." (Doc. 13 ¶ 58.)

(Doc. 20, 2–6) (footnotes omitted).

At a case-management conference held after the denial of Defendant's motion to reconsider, Defendant requested that the Court make its recent orders final and appealable. Based on this request, the Court set a briefing schedule for Defendant's

5

motion to certify appeal. (Docket Entry of 11/22/2011.) The issues raised therein are now before this Court.

## II.    Legal Analysis

Defendant's motion to certify appeal asks this Court to certify its prior Orders for an immediate appeal under 28 U.S.C. § 1292(b). Defendant maintains that because § 1292(b)'s requirements have been satisfied, and because compelling equitable considerations exist, this Court should stay further proceedings in this action and permit Defendant to immediately appeal to the Sixth Circuit Court of Appeals. (Doc. 26, 5.)

### A.    Legal Standards

Title 28 U.S.C. § 1292(b) "'confer[s] on district courts first line discretion to allow interlocutory appeals.'" *Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 504 (6th Cir. 2011) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995)). "As a threshold matter, interlocutory appeals in the federal system are generally disfavored." *Alexander v. Provident Life & Accident Ins. Co.*, 663 F. Supp. 2d 627, 639 (E.D. Tenn. 2009) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368 (1981). "'Attractive as it may be to refer difficult matters to a higher court for advance decision, such a course of action is contrary to our system of jurisprudence.'" *Id.* (quoting *Trollinger v. Tyson Foods, Inc.*, No. 4:02–CV–23, 2006 WL 2868980, at *3 (E.D. Tenn. Sept. 29, 2006)). "Review under § 1292(b) is granted sparingly and only in exceptional cases." *W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. City of Memphis* (*In re City of Memphis*), 293 F.3d 345, 350 (6th Cir. 2002). As the Sixth Circuit explained, "'Congress intended that section 1292(b) should be sparingly applied. It is to be used only in exceptional cases where an intermediate appeal may avoid protracted and expensive

litigation and is not intended to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation.'" *Kraus v. Bd. of Cnty. Road Comm'rs of the Cnty. of Kent*, 364 F.2d 919, 922 (6th Cir. 1966) (quoting *Milbert v. Bison Labs., Inc.*, 260 F.2d 431, 433 (3d Cir. 1958)). Perhaps most significantly for this case, "§ 1292(b) is not appropriate for securing early resolution of disputes concerning whether the trial court properly applied the law to the facts." *Howe v. City of Akron*, 789 F. Supp. 2d 786, 810 (N.D. Ohio 2010) (citing *Link v. Mercedes-Benz of N. Am., Inc.*, 550 F.2d 860, 863 (3d Cir. 1977)); *see also In re Gray*, 447 B.R. 524, 534 (E.D. Mich. 2011) (refusing to grant § 1292(b) appeal because questions posed required factual determinations); *Gieringer v. Cincinnati Ins. Cos.*, No. 3:08-cv-267, 2010 WL 2572054, at *3 (E.D. Tenn. June 18, 2010) (refusing to apply § 1292(b) where "Defendant is challenging this Court's application of law to the facts because of its own disagreement with the outcome, rather than presenting a situation where there are substantial disputes as to the applicable law"); *In re ASC Inc.*, 386 B.R. 187, 196 (E.D. Mich. 2008) ("factual determinations are not appropriate for interlocutory review," and, "[i]nterlocutory appeals are intended for situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts"); *In re Pilch*, No. 1:07-CV-306, 2007 WL 1686308, at *4 (W.D. Mich. June 8, 2007) (refusing to apply § 1292(b) where an appeal "presents a mixed question of law and fact"); *Sanderson Farms, Inc. v. Gasbarro*, No. 2:07-CV-00857, 2007 WL 3402539, at *3 (S.D. Ohio Nov. 13, 2007) (refusing to apply § 1292(b) where the court was required to apply the law to the facts).

Title 28 U.S.C. § 1292 states as follows:

7

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). To establish that relief should be granted under § 1292(b), a district court must consider whether: "(1) the order involves a controlling question of law, (2) a substantial ground for difference of opinion exists regarding the correctness of the decision, and (3) an appeal may materially advance the ultimate termination of the litigation." *In re City of Memphis*, 293 F.3d at 350.

Defendant makes two overall arguments here: (1) § 1292(b)'s requirements have been satisfied, and (2) there is an equitable concern that favors certification of an appeal. (Doc. 26, 5, 12.) Defendant further argues that if the Court certifies an appeal, it should stay this action. (Doc. 26, 14.) The Court addresses each of these issues seriatim.

### B.     Certification of an Appeal under § 1292(b)

Defendant first argues that all of the elements required to grant relief under § 1292(b) are present here. (Doc. 26, 5.) Each element is addressed below.

### 1.     § 1292(b)'s First Element—A Controlling Question of Law

The first element a Court must consider in deciding whether to grant relief under

8

§ 1292(b) is whether the order involves a controlling question of law.  28 U.S.C. §

1292(b); *In re City of Memphis*, 293 F.3d at 350.  "A question of law is controlling if

reversal of the district court's order would terminate the action."  *Howe*, 789 F. Supp. 2d

at 810 (internal quotations omitted) (quoting *Genentech, Inc. v. Novo Nordisk A/S*, 907

F. Sup. 97, 99 (S.D.N.Y. 1995)).  In other words, "[a] legal issue is controlling if it could

materially affect the outcome of the case."  *In re City of Memphis*, 293 F.3d at 351.

As many cases recognize, there are actually two requirements within what this

Court (and most others) has labeled as § 1292(b)'s first element: "(1) The question

involved must be one of law; [and] (2) It must be controlling."  *Mason v. Massie*, 335

B.R. 362, 369 (N.D. Ohio 2005); *see also Dungan v. Chase Home Fin., LLC*, No. 10-

14549, 2011 WL 4737581, at *2 (E.D. Mich. Oct. 7, 2011); *In re A.P. Liquidating Co.*,

350 B.R. 752, 755 (E.D. Mich. 2006); *Cronovich v. Dunn*, 573 F. Supp. 1340, 1342

(D.C. Mich. 1983).  As § 1292 states, an order must present a "question of law" that is

"controlling."  28 U.S.C. § 1292(b).

Although Defendant's motion is not entirely clear on this point, (*see* Doc. 26, 7–8)

Defendant's reply in support presents three controlling questions of law: "(1) whether

plaintiff's failure to allege with particularity the presentment of a single false claim *to the*

*government* requires dismissal of his complaint under applicable Sixth Circuit

precedent, (2) whether the "strong inference" exception mentioned, but not applied, by

the Sixth Circuit in Chesbrough v. VPA, P.C., 655 F.3d 461 (6th Cir. 2011), retains any

vitality in the *qui tam* context, and (3) if so, whether Elliott's allegations bring his

complaint within that exception," (Doc. 28, 2).  Because the question of dismissal of a

complaint pursuant to Rule 12(b)(6) is a question of law, *Ass'n of Cleveland Fire*

*Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007); *see also Ybarra v. K & S Flooring Servs., LLC*, No. 1:07-CV-1249, 2008 WL 607267, at *1 (W.D. Mich. Feb. 29, 2008) ("Whether dismissal is proper pursuant to Federal Rule of Civil Procedure 12(b)(6) is a question of law."), the Court accepts without discussion Defendant's assertion that each of these three questions are questions of law.

The second requirement of § 1292(b)'s first element asks whether there is a "controlling" question of law. *Mason v. Massie*, 335 B.R. 362, 369 (N.D. Ohio 2005); 28 U.S.C. § 1292(b). Here, Defendant argues that the questions presented in this case are controlling because "a legal ruling would be substantively dispositive of [Plaintiff's] theories of liability." (Doc. 26, 7.) Because Defendant's three questions are of primary importance in this matter, the Court again accepts without discussion Defendant's assertion that each of its three questions are "controlling" questions of law.

## 2. § 1292(b)'s Second Element—A Substantial Ground for Difference of Opinion

The second element a Court must consider when deciding whether to allow an interlocutory appeal under § 1292(b) is whether a substantial ground for difference of opinion exists regarding the correctness of the decision. 28 U.S.C. § 1292(b); *In re City of Memphis*, 293 F.3d at 350. In other words, an appeal is warranted when there is a substantial difference of opinion regarding the questions of law identified in the first element. *See In re City of Memphis*, 293 F.3d at 350. "A 'difference of opinion' is established 'when (1) the case is difficult and of first impression; (2) a difference of opinion exists within the controlling circuit; or (3) the circuits are split on the issue.'" *In re Regions Morgan Keegan ERISA Litig.*, 741 F. Supp. 2d 844, 849 (W.D. Tenn. 2010)

(quoting *Gaylord Entm't Co. v. Gilmore Entm't Group*, 187 F. Supp. 2d 926, 956 (M.D. Tenn. 2002)).  Defendant argues that such a difference of opinion exists here because "the Sixth Circuit itself would disagree with the Court's reading of *Chesbrough* and its application of the 'strong inference' exception."  (Doc. 26, 8.)

        In its motion to reconsider and memorandum in support (Docs. 22 & 22-1) Defendant argued that this Court's Order denying its motion to dismiss failed to consider a recently issued, dispositive Sixth Circuit opinion—*Chesbrough v. VPA, P.C.*, 655 F.3d 461 (6th Cir. 2011).  (Doc. 22, 1.)  More specifically, Defendant argued that under *Chesbrough*'s interpretation of Rule 9(b), which requires False Claims Act violations to be alleged with particularity, *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 445 (6th Cir. 2008); Fed. R. Civ. P. 9(b), Plaintiff's Amended Complaint failed to state a claim because Plaintiff did not specifically identify any individual false claim that was presented to the federal government (Doc. 22-1, 2).  However, this Court applied an exception to the normal rule that a plaintiff must particularly plead that a fraudulent claim for payment has been submitted to the government.  (Doc. 25, 17); *Chesbrough*, 655 F.3d at 470 (citing *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.* (*Bledsoe II*), 501 F.3d 493, 510 (6th Cir. 2007)).  As this Court recognized in its Order on Defendant's motion to reconsider (Doc. 25, 17), *Chesbrough* stated as follows:

> *Bledsoe* [*II*] left open the possibility that a court may "relax" the requirements of Rule 9(b) "in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator."

655 F.3d at 470 (quoting *Bledsoe II*, 501 F.3d at 504 n.12).  This is the "strong inference" exception.  (Doc. 25, 17.)  As *Chesbrough* further explained, "case law . . .

suggests that the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a *strong inference* that a claim was submitted." 655 F.3d at 471 (emphasis added). This Court disagreed with Defendant's reading of *Chesbrough* and held as follows:

> *Chesbrough* did not overturn or even modify earlier Sixth Circuit holdings that this Court relied on its prior Order [on Defendant's motion to dismiss]. Rather, *Chesbrough* relied on and cited many of the same cases and rules as this Court did. *Compare* Doc. 20, *with Chesbrough*, 655 F.3d 461. Instead of overturning prior precedent, *Chesbrough* reaffirmed that precedent—the same precedent this Court relied on in its prior Order, in particular, the Sixth Circuit case of *Bledsoe II*. *See* 655 F.3d at 470–71. Moreover, the arguments Defendant presents in its motion to reconsider are nothing more than a restatement of arguments this Court has already considered and rejected. Defendant's arguments have not changed, and *Chesbrough* did not change the required analysis applicable to those arguments.

(Doc. 25, 17–18.) Upon an examination of the underlying facts, (Doc. 25, 18–19) this Court held that "Plaintiff's Amended Complaint creates a 'strong inference' that a false claim was submitted to the government," (Doc. 25, 18). Overall, this Court held that *Chesbrough* "provides no reasons justifying relief from this Court's Order denying Defendant's motion to dismiss" (Doc. 25, 20–21).

With that as background, the Court now considers whether there is a substantial difference of opinion regarding the three questions of law Defendant identified above. *See In re City of Memphis*, 293 F.3d at 350. The three questions Defendant raised are, "(1) whether plaintiff's failure to allege with particularity the presentment of a single false claim *to the government* requires dismissal of his complaint under applicable Sixth Circuit precedent, (2) whether the "strong inference" exception mentioned, but not

applied, by the Sixth Circuit in <u>Chesbrough v. VPA, P.C.</u>, 655 F.3d 461 (6th Cir. 2011), retains any vitality in the *qui tam* context, and (3) if so, whether Elliott's allegations bring his complaint within that exception," (Doc. 28, 2). The Court considers each of these questions in detail.

### a. No Substantial Difference of Opinion Regarding Defendant's First and Third Questions of Law

Defendant's first and third questions can be disposed of quickly because they are not the pure questions of law that § 1292(b) demands. *See Howe*, 789 F. Supp. 2d at 810 ("§ 1292(b) is not appropriate for securing early resolution of disputes concerning whether the trial court properly applied the law to the facts."); *In re ASC Inc.*, 386 B.R. at 196 ("Interlocutory appeals are intended for situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts."); *In re Pilch*, 2007 WL 1686308, at *4 (refusing to apply § 1292(b) where an appeal "presents a mixed question of law and fact"). Instead, Defendant's first and third questions call for an application of law to the facts, something that is "not appropriate" under § 1292(b). *Howe*, 789 F. Supp. 2d at 810

Defendant's first question asks whether plaintiff's failure to particularly allege the presentment of false claim for payment to the government requires dismissal. (Doc. 28, 2). Recall that Defendant must show a "difference of opinion" regarding its questions of law, *In re City of Memphis*, 293 F.3d at 350, and a "difference of opinion" is, "when (1) the case is difficult and of first impression; (2) a difference of opinion exists within the controlling circuit; or (3) the circuits are split on the issue," *In re Regions Morgan*, 741 F.

Supp. 2d at 849 (internal quotations omitted).  But there is no difference of opinion regarding whether a False Claims Act plaintiff must particularly allege the presentment of a false claim for payment.  *See Chesbrough*, 655 F.3d at 470; *Bledsoe II*, 501 F.3d at 510.  That rule is solidly and uncontroversially established.  *See id.*  Defendant is merely arguing with this Court's application of that law to the facts in this particular case, and that is not an appropriate use of § 1292(b).  *See Howe*, 789 F. Supp. 2d at 810.  Similarly, Defendant's third question asks whether Plaintiff's allegations fall within *Chesbrough*'s strong-inference exception.  (Doc. 28, 2).  Once again, there is no dispute over a question of law here.  Rather, Defendant is faulting this Court's application of the law to the facts.  And "§ 1292(b) is not appropriate for securing early resolution of disputes concerning whether the trial court properly applied the law to the facts."  *Howe*, 789 F. Supp. 2d at 810.

Defendant's own statements highlight the correctness of this holding.  For example, where Defendant argues that "*Chesbrough* is directly on point, and the Sixth Circuit might well disagree with its application in the subject Orders," (Doc. 26, 10) Defendant is rearguing this Court's application of the law to the facts.  Similarly, Defendant states that "the issues of law are unique in this case, particularly the application of the 'strong inference' exception as mentioned in the Court's most recent order." (Doc. 26, 16).  Once again, certifying an appeal under § 1292(b) for a dispute over the application of the law to the facts is improper.  *Howe*, 789 F. Supp. 2d at 810.

Before continuing, the Court pauses to note that several of Defendant's arguments here repeat ones that the Court has already addressed its prior Order.  (*See* Doc. 26, 10; Doc. 28, 3–4.)  This also is an improper use of § 1292(b).  *See Alexander*

14

*v. Provident Life & Accident Ins. Co.*, 663 F. Supp. 2d 627, 639 (E.D. Tenn. 2009).

Given that this Court has already considered, and rejected, Defendant's arguments

regarding whether Plaintiff's Amended Complaint is particularly pled (Doc. 25, 16–19,

20) and whether *Chesbrough* is directly on point, (Doc. 25, 18–20) Defendant's motion

under § 1292(b) is not an opportunity to relitigate these issues.  As occurred in

*Alexander v. Provident Life and Accident Insurance Co.*, 663 F. Supp. 2d 627, 639 (E.D.

Tenn. 2009), Defendant does not point to controlling authority raising a difference of

opinion regarding the two above-discussed controlling questions of law (*see* Docs. 26 &

28).  Instead, Defendant merely repeats arguments addressed in the Court's decision

on its motion to reconsider.  *See id.*; (*see also* Doc. Doc. 26, 10; Doc. 28, 3–4).  This

Court previously distinguished *Chesbrough* based on the facts (Doc. 25, 18–20) ("based

on all the facts plead, Plaintiff's Amended Complaint creates a 'strong inference' that a

false claim was submitted to the government"), and this Court previously found that

"Plaintiff meets the particularly requirements of Rule 9(b) by providing sufficient detail

regarding the time, place, and content of Brickman's alleged fraud," (Doc. 25, 20) (citing

Doc. 20, 21).  This is not an occasion to reargue those decisions.

### b. No Substantial Difference of Opinion Regarding Defendant's Second Question of Law

Defendant's second question of law asks "whether the 'strong inference'

exception mentioned, but not applied, by the Sixth Circuit in Chesbrough v. VPA, P.C.,

655 F.3d 461 (6th Cir. 2011), retains any vitality in the *qui tam* context."  (Doc. 28, 2.)

More specifically, Defendant argues that *Bledsoe II* did not expressly establish the

"existence of any such exception to the general rule that an allegation of an actual false

15

claim is a necessary element of [a False Claims Act] violation." (Doc. 26, 9.) Rather, Defendant argues that "*Bledsoe* [*II*] merely mentioned the <u>possibility</u> that some sort of exception could conceivably be formulated; at the same time, the court expressly declined to speculate as to whether such an exception in fact existed." (Doc. 26, 9) (citing *Bledsoe II*, 501 F.3d at 504 n.12). Furthermore, Defendant argues that while *Chesbrough* did not foreclose the existence of the strong-inference exception derived from *Bledsoe II*, neither did it endorse or apply such an exception. (Doc. 26, 9.) Defendant states, "The *Chesbrough* court said only that the 'strong inference' that a claim was submitted '<u>may</u> arise when the relator has "personal knowledge that the claims were submitted by Defendants . . . for payment."'" (Doc. 26, 9) (quoting *Chesbrough*, 655 F.3d at 471) (emphasis added). In sum, Defendant maintains that the question of law over which there is a difference of opinion here is whether the strong-inference exception exists. (Doc. 26, 9.) In other words, the legal issue is the existence of the strong-inference exception, which *Bledsoe* and *Chesbrough* only implied might exist in uncertain circumstances. (*See* Doc. 26, 9.)

Defendant is incorrect where it states that no Sixth circuit case has applied the strong-inference exception. (Doc. 26, 9.) In fact, *Chesbrough* itself applied the strong-inference exception.[3] In considering whether the plaintiffs in that case sufficiently alleged that fraudulent claims were submitted to the government, *Chesbrough* discussed *Bledsoe II* in detail. 655 F.3d at 470. After holding that the plaintiffs in that case could not identify any actual claims submitted to the government, *Chesbrough* went only to discuss the strong-inference exception introduced in *Bledsoe II*. *Id.* *Chesbrough* analyzed this exception in significant detail and discussed the cases that

---

[3] It appears to the Court that Defendant has willfully chosen to ignore this obvious fact.

*Bledsoe II* relied on to create that exception. *Id.* at 470–71. *Chesbrough* then considered the plaintiff's argument that this relaxed standard should apply in that case. *Id.* at 471. At that point, the Sixth Circuit could have specifically foreclosed the existence of such a strong-inference exception. The Court did not. *Id.* Rather, it refused to do so. Having the opportunity to definitively do away with the strong-inference exception, and passing on that opportunity, lends credence to the theory that such an exception actually exists. In other words, because the Sixth Circuit refused to "kill" the exception created in *Bledsoe II*, the exception necessarily remains "alive." As the Sixth Circuit stated, "we do not foreclose the possibility that this court may apply a 'relaxed' version of Rule 9(b) in certain situations, we do not find it appropriate to do so here." *Id.*

This leads to a second point. Not only does this quote affirm the existence of the strong-inference exception, as just discussed, but *Chesbrough* specifically applied that exception to its facts. *See id.* Reaffirming the rule's existence, *Chesbrough* states, "The case law just discussed suggests that the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Id.* Applying this strong-inference exception that it had just identified and defined, *Chesbrough* states, "[h]ere, the Chesbroughs lack the personal knowledge of billing practices or contracts with the government that the relators had in cases like *Lane [v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07-cv-4, 2010 WL 1926131 (E.D. Tenn. May 12, 2010)]." *Id.* at 471–72. The Court went on to apply the strong-inference exception to the facts in greater depth, and it identified "a series of

17

assumptions" that would have had to be true for the exception to apply.  *Id.* at 472. After specifically applying the exception, the Court concluded, "this is not a situation in which the alleged facts support a strong inference . . . that a false claim was presented to the government."  *Id.*  The Sixth Circuit would not apply an exception that does not exist, as Defendant contends.  Rather, it applied the exception exactly because it does exist and because ignoring it would have been ignoring binding precedent.  Any other reading of *Chesbrough* ignores the obvious.

Furthermore, recognizing that *Chesbrough* provided an example of how the strong-inference exception should be applied, this Court specifically used it as a model to apply that exception in its prior Order on Defendant's motion for reconsideration. (Doc. 25 18–19.)  In holding that Plaintiff's Amended Complaint did indeed "create a strong inference that false claims were submitted to the government," this Court specifically compared the facts applied to the exception in *Chesbrough* to the facts of the present case.  (Doc. 25, 18–29); *Chesbrough*, 655 F.3d at 472.  Not only does the strong-inference exception exist, but in light of *Chesbrough* it undisputedly retains its vitality, and *Chesbrough* provides the perfect model showing how it should be applied. *See Chesbrough*, 655 F.3d at 471–72.

Plaintiff fails to address these issues, (*see* Doc. 27), but Defendant's own statements illustrate why it fails to demonstrate a substantial ground for difference of opinion here.  Defendant states that "[t]he *Chesbrough* court found no such exception because the relators lacked 'the personal knowledge of billing practices or contracts with the government' that might support such an inference as their personal knowledge was 'limited to the allegedly fraudulent scheme.'"  (Doc. 26, 9–10) (quoting *Chesbrough*

18

. . .).  But this is misleading.  Rather, as has just been explained, *Chesbrough* found that the strong-inference exception did not apply based on the particular facts in that case. *Chesbrough*, 655 F.3d at 472.

Going directly to Defendant's argument that the legal issue here is the existence of the strong-inference exception, (Doc. 26, 9) recall that Defendant's burden is to show that "(1) the case is difficult and of first impression; (2) a difference of opinion exists within the controlling circuit; or (3) the circuits are split on the issue."  *In re Regions Morgan*, 741 F. Supp. 2d at 849.  Defendant has not argued the first or third points here—that the existence of the strong-inference exception is a difficult issue and one of first impression or that the circuits are split on this issue.  (*See* Docs. 26 & 28.) Defendant instead maintains that in relation to the strong-inference exception, "Brickman is not aware of any case in which the Sixth Circuit has found such an exception to definitively exist, much less apply."  (Doc. 26, 9.)  This Court definitively disagrees with this statement, because, as has been shown, *Chesbrough* itself found the exception to exist, and *Chesbrough* itself applied the exception.  Further analysis on this point is unnecessary.

Defendant has failed to establish the second required element of § 1292(b). There are no substantial grounds for difference of opinion regarding the correctness of the decision in relation to Defendant's questions of law.  *See* 28 U.S.C. § 1292(b); *In re City of Memphis*, 293 F.3d at 350.  There are no substantial differences of opinion regarding any of the three questions of law presented by Defendant.

c.      **"The Level of Uncertainty"**

Defendant additionally argues that "'[t]he level of uncertainty required to find a

19

substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case.'"  (Doc. 26, 10) (quoting 16 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure*, § 3930 (2d ed. West 2008).  In other words, Defendant maintains that because the viability of Plaintiff's primary claim and the future course of these proceedings hinge on the determination of the issues presented here, this Court should apply a lower standing in determining whether a substantial ground for difference of opinion exists.  (*See* Doc. 26, 10; Doc. 28, 5.)  First, as discussed above, no differences of opinion exist on Defendant's questions of law.  Second, Defendant's argument here ignores the fact that an interlocutory appeal in Defendant's favor would only dispose of one of Plaintiff's claims.  As this Court noted in its prior Order, "Defendant's motion to reconsider does not directly challenge Plaintiff's second count, which alleges [False Claims Act] retaliation," and, "Rule 9(b)'s particularity requirement was not at issue in relation to Plaintiff's second count . . . because as Defendant acknowledges, such claims are subject to Rule 8's relaxed notice-pleading standard."  (Doc. 25, 21, 6 n.3.)  Thus, even if Defendant were successful on appeal, Plaintiff's second count would remain to be litigated by this Court.  This point naturally flows into § 1292(b)'s next element.

### 3. § 1292(b)'s Third Element—Appeal May Materially Advance the Termination of the Litigation

The third element a Court must consider when deciding whether to grant relief under § 1292(b) is whether an immediate appeal may materially advance the ultimate termination of the litigation.  28 U.S.C. § 1292(b); *In re City of Memphis*, 293 F.3d at 350.  "An interlocutory appeal will materially advance the litigation if it will 'save

substantial judicial resources and litigant expense.'"  *In re Regions*, 741 F. Supp. 2d at

849 (quoting *W. Tenn. Chapter of Assoc. Builders & Contractors, Inc v. City of*

*Memphis*, 138 F. Supp. 2d 1015, 1026 (W.D. Tenn. 2000)).  "Under this standard, 'an

interlocutory appeal is more appropriate early in the proceedings, particularly in

protracted and expensive cases, where failure to resolve a question of law early in the

case could lead to the placement of an enormous burden on the parties.'"  *Id.* (quoting

*Black & Decker, Inc. v. Smith*, No. 07–1201, 2008 WL 3850825, at *10 (W.D. Tenn.

Aug. 13, 2008).  This analysis appears to overlap with the first element's determination

of whether the question of law presented is "controlling."  If a question of law is

"controlling," and if an appeal definitively determines that question, then such an appeal

will almost certainly "materially advance the ultimate termination of the litigation," and,

"save substantial judicial resources and litigant expense."  28 U.S.C. § 1292(b); *In re*

*Regions Morgan*, 741 F. Supp. 2d at 849.

But as previously mentioned, regardless of the result of an interlocutory appeal,

Plaintiff's second count would remain to be litigated in this Court.  As a result, an

immediate appeal would not materially advance the ultimate *termination* of the litigation.

Recognizing this, Defendant argues that "advancing the ultimate termination of the

litigation does not necessarily mean dismissal of all claims in the event the Court of

Appeals reverses the District Court."  (Doc. 26, 11.)  Defendant maintains that even if

Plaintiff's retaliation claim were to survive, at least the course of discovery would

change dramatically.  (Doc. 26, 12 n.7.)  Furthermore, even if the Sixth Circuit were to

accept an interlocutory appeal and affirm this Court's decisions, several of its legal

defenses would be "effectively foreclosed," and the litigation would necessarily be

simplified.  (Doc. 26, 12.)

Defendant additionally argues that the intent behind § 1292(b)—to avoid protracted and expensive litigation—"meshes perfectly with the heightened pleading standard applicable to FCA claims"—the prevention of fishing expeditions, to protect defendants' reputations from allegations of fraud, and to narrow potentially wide ranging discovery to relevant matters.  (Doc. 26, 11) (citing *Abrams v. United Steel Workers of Am., AFL-CIO-CLC*, No. 1:07-CV-181, 2009 WL 700699, at *2 (S.D. Ohio, Mar. 13, 2009) and *Chesbrough*, 655 F.3d at 466).  Defendant contends that "[b]oth of these goals would be advanced by allowing an immediate appeal of the Court's Orders." (Doc. 26, 11.)

This Court generally agrees with each of Defendant's points here.  Regardless of the outcome, an interlocutory appeal would, at least to a limited extent, materially advance the ultimate termination of this litigation.  However, given that "[r]eview under § 1292(b) is granted sparingly and only in exceptional cases," *In re City of Memphis*, 293 F.3d at 350, and more importantly, given that there is no substantial ground for difference of opinion regarding the questions of law underlying this Court's prior decisions, granting leave to file an interlocutory appeal would be inappropriate here.

### 4.    § 1292(b) Conclusion

In enacting § 1292(b), "'Congress . . . chose to confer on district courts first line discretion to allow interlocutory appeals.'"  *Turi*, 633 F.3d at 504 (quoting *Swint*, 514 U.S. at 47).  Because this is not an exceptional case presenting a question of law as to which there is substantial ground for difference of opinion, this Court holds that an immediate appeal here would not materially advance the ultimate termination of this

litigation.  *See* 28 U.S.C. § 1292(b); *In re City of Memphis*, 293 F.3d at 350.  Although there are controlling questions of law presented here, and although appellate review of those questions would advance the termination of this litigation to a limited extent, there are not a substantial grounds for difference of opinion on any of those questions.  For each of the reasons stated above, Defendant's request for an order permitting an immediate appeal of this Court's prior Orders is DENIED.

### C.     Defendant's Equitable Concerns

Defendant's presentation of what it labels "powerful equitable concerns" does not alter this Court's decision to deny Defendant's requested relief.  Defendant maintains that it has information that Plaintiff Mark Elliott and another former employee of Defendant are "planning to go into business and go after Brickman customers as soon as their respective non-compete agreements expire[ ] in early 2012."  (Doc. 26, 13; Doc. 26-1, 1–2.)

In support of this allegation, Defendant presents the Declaration of Thomas A. Brown, a Brickman employee.  Mr. Brown specifically alleges, among other things, that Plaintiff has started a landscaping and snow removal business to compete with Defendant and he has already presented proposals to prospective clients.  (Doc. 26-2, 1–2.)  Defendant maintains that because Plaintiff seeks "highly confidential and proprietary information regarding Brickman's billing practices and other business strategies. . . . there can be little doubt that this information would be put to improper competitive use."  (Doc. 26, 13.)

But in point of fact, there a great deal of doubt here, and the Court cannot determine the truth because Plaintiff Mark Elliott has filed a Declaration of his own (Doc.

27-2).  Implicitly denying Defendant's allegations, Plaintiff's Declaration (Doc. 27-2) states, "I have no intention of EVER working in the green industry in this market or any other market in the United States."  (Doc. 27-2, 2.)  It would be impossible for Plaintiff to compete with Defendant, as Defendant alleges Plaintiff intends, if Plaintiff never again works in Defendant's industry.  Thus, Defendant appears to be incorrect where it states that "the Brown Declaration stands unrebutted."  (Doc. 28, 2.)  While Plaintiff does not deny each of Defendant's specific allegations, (*compare* Doc. 26-1, *with* Doc. 27-2) his Declaration does not appear to be a pure pregnant denial given that he denies being "involved in any manner or way . . . with any organization associated with the green industry," and, that he has "no intention of EVER working in the green industry in this market or any other market in the United States."  (Doc. 27-2, 2.)  As Defendant implies, (Doc. 28, 2) Plaintiff may be deceptively defining the term "green industry" in a non-standard way, but upon a plain-meaning reading, Plaintiff's Declaration denies of the main thrust of Defendant's allegations.  Because a plain reading of both Declarations shows that both of them cannot be simultaneously true, the Court cannot consider Defendant's equitable concern here by picking and choosing whose declaration to believe.  Simply put, the facts here are unclear.

Given Defendant's fears of unfair competition based on Plaintiff's access to confidential documents, a protective order would seem to be the natural solution.  But Defendant maintains that "a protective order would be worthless" given Plaintiff's desire to gain access to Defendant's "[c]lient lists, bidding information, [and] internal pricing schemes."  (Doc. 26, 13.)  Defendant contends that this equitable consideration "mandate[s] that any lingering questions be resolved in favor of certification."  (Doc. 26,

14.)  The Court disagrees, in part, because it does not have any lingering questions about certification.  As addressed above, the result here is certain because Defendant has presented no disputed questions of law.  Additionally, a doubt about the effectiveness of a protective order is not a factor going to the application of § 1292(b).  The cases Defendant cites do not support its argument.  (*See* Doc. 26) (citing *Iowa Beef Processors Inc. v. Bagley*, 601 F.2d 949, 953–54 (8th Cir. 1979) and *United States v. U.S. Dist. Ct. for E. Dist. of Mich.*, 444 F.2d 651, 655–56 (6th Cir. 1971)).  Both of Defendant's cases specifically state that § 1292 is not at issue, and thus, they are distinguishable on that basis alone.  *See Iowa Beef Processors*, 601 F.2d at 953; *U.S. Dist. Ct. for E. Dist. of Mich.*, 444 F.2d at 655.

Defendant's equitable considerations do not change this Court's decision to deny its request for an order permitting an immediate appeal.  To this extent, Defendant's motion to certify appeal is DENIED.

### D.    Stay

Defendant's final request is for a stay of this action pending the outcome of an interlocutory appeal.  Given the Court's denial of the remainder of Defendant's motion, the question of a stay is moot.  Because § 1292(b) provides that a request for an interlocutory appeal "shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order," a stay is not proper at this time.  *See* 28 U.S.C. § 1292(b).  Defendant's motion to certify appeal is DENIED to this extent.

### III.    Conclusion

Based on the foregoing, Defendant Brickman's Motion to Certify Interlocutory

Appeal and Stay Proceedings (Doc. 26) is **DENIED** in its entirety.  Defendant has failed to show that this is an exceptional case warranting the grant of permission to file an interlocutory appeal under 28 U.S.C. § 1292.  This case shall proceed as previously ordered.

      **IT IS SO ORDERED**.

_s/Michael R. Barrett_
United States District Judge
