# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES** *ex rel.* **MARK ELLIOTT,** | : : : | CASE NO. 1:10CV392 |
| **Plaintiff,** | : : : | (Judge Michael Barrett) |
| vs. | : : : | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **THE BRICKMAN GROUP LTD., LLC,** | : : : | **(ORAL ARGUMENT REQUESTED)** |
| **Defendant.** | : : | |

Pursuant to Federal Rule of Civil Procedure 56, Defendant The Brickman Group Ltd., LLC hereby moves the Court for an order granting Summary Judgment on the Amended Complaint of Plaintiff-Relator Mark Elliott. The plain language of the applicable federal lease agreements requires that the claims against Brickman be dismissed in their entirety. A Memorandum in Support of this Motion is attached hereto.

Respectfully submitted,

OF COUNSEL:

GRAYDON HEAD & RITCHEY LLP
Fifth Third Center
Walnut Street
Cincinnati, OH  45202-3157
Phone: (513) 621-6464
Fax:    (513) 651-3836

/s/ Steven P. Goodin
Steven P. Goodin  (0071713)
Katherine M. Lasher (0070702)
*Attorneys for Defendant*
GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45202-3157
Direct:513-629-2845
Fax:(513) 651-3836
Sender E-Mail:sgoodin@graydon.com

4004085.1

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**

**MOTION FOR SUMMARY JUDGMENT**

**I.  OVERVIEW**

The dispositive issue in this case is whether causes of action brought under the False Claims Act ("FCA") can survive as a matter of law when the undisputed evidence establishes that the government suffered no harm.

Both the statutory language and interpretative case law are crystal-clear on this point. At a minimum, a FCA relator must be able to demonstrate that the defendant *intentionally* caused a false claim to be submitted to the federal government, and that the false claim was in fact paid. *See, inter alia, U.S. ex rel. Marlar v. BWXT Y-12,* LLC., 525 F.3d 439, 445 (6th Cir. 2008). Here, the third-party lease agreements which govern the services in question foreclose even the most remote possibility that the controverted charges "passed through" to the federal government. Thus, both of Plaintiff-Relator's claims fail as a matter of law, and are ripe for summary judgment.

**II.  STATEMENT OF UNDISPUTED MATERIALS FACTS**

The following facts are undisputed as a matter of record:

- Defendant The Brickman Group Ltd. LLC ("Brickman"), a national lawn maintenance and landscaping company, never entered into a contract with the General Services Administration ("GSA") or any other federal entity. Instead, Brickman contracted to perform lawn maintenance and landscaping services for three Cincinnati-area office parks maintained by Duke Realty ("Duke"), a privately-owned, national property management company. *See* Plaintiff-Relator's Amended Complaint ("Complaint") at ¶¶ 11, 37-38.

- The vast majority of the tenants in these Duke-managed office parks were private corporate tenants. However, a sliver of the square-footage was leased to federal tenants such as the Internal Revenue Service and other agencies in need of overflow office space. *See* Complaint at ¶¶ 11, 17 and 18.

- In order to rent small portions of its premises to a few federal tenants, Duke entered into lease agreements with the GSA ("GSA Lease Agreements"). The

- applicable GSA Lease Agreements for the three Cincinnati-area Duke properties are attached hereto as Exhibits A, B and C.

- As even Plaintiff-Relator Mark Elliott ("Plaintiff-Relator") has acknowledged, the GSA Lease Agreements are standardized form leases containing universal terms. Deposition of Plaintiff-Relator Mark Elliott, December 7, 2012 ("Elliott Depo.") at p. 255 ("… this is a General Services Administration prefabricated form that is used throughout the United States and overseas …").  A transcript of his deposition has been attached hereto as Exhibit D.

- Any increases to annual payments to Duke under the GSA Lease Agreements are limited to concomitant increases in the national cost of living as measured by the Consumer Price Index ("CPI").  This provision in the GSA Lease Agreements expressly encompasses increases in landscaping and other operational costs. Thus, even if Brickman were to have presented inflated or "false" claims for payment to Duke, as alleged by the Plaintiff-Relator, Duke would not be able to pass them on to the federal government, as would be necessary to sustain a claim under the FCA. *See, e.g.,* Ex. A at DU00298, para. D3.

The evidentiary record is complete inasmuch as the essential elements of the claims are concerned.  For instance, no countervailing facts could conceivably be adduced that would change the plain language found in the GSA Lease Agreements.  Given the manifest lack of an actionable *qui tam* theory of liability, both of Plaintiff-Relator's claims in his Complaint must be dismissed pursuant to Civil Rule 56.

### III.  STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and … the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C).  "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  In opposing a motion for summary judgment, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 458-459 (6th Cir. 2004) (quoting Celotex Corp., 477 U.S. at 324).

Here, the voluminous discovery produced to date encompasses all applicable billing records, as well as all relevant contracts (including the Duke-Brickman Master Contract) and personnel files. The Plaintiff-Relator has been deposed at length. Crucially, Duke has provided all of the applicable GSA Lease Agreements for the Cincinnati region pursuant to subpoena issued by the Plaintiff-Relator. Given the plain language of the GSA Lease Agreements, Brickman is entitled to summary judgment as a matter of law.

## IV.  LAW AND ARGUMENT

### A.  Plaintiff-Relator's FCA Claim, Count One of His Complaint, Fails As A Matter Of Law Due To The Plain Language Of The GSA Lease Agreements.

The FCA imposes liability when "(1) a person presents, or causes to be presented, a claim for payment or approval [to the federal government]; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken 'knowingly,' i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 640 (citing 31 U.S.C.§ 3792(a)(1)&(b)(1994)). The companion provision, 31 U.S.C. § 3729(a)(2), imposes separate FCA liability when the defendant "made a false statement or created a false record" and that statement was "made with the purpose of getting a false or fraudulent claim paid or approved by the Government." *U.S. ex rel SNAPP v. Ford Motor Co.*, 532 F.3d 496 504-05(6th Cir. 2008).

Here, the plain language of the three GSA Lease Agreements for Duke properties in the Cincinnati area[1] obviate any possible claim regarding purportedly inflated landscaping services

---

[1] Despite Plaintiff-Relator's initial claims of widespread federal tenancy in the Cincinnati area, the GSA Lease Agreements produced by Duke pursuant to subpoena revealed only *three* such federal lease agreements – two separate (and consecutive) agreements for a small amount of space at an office park located at 38 Triangle Park

4

or materials being imposed on the federal government. As noted above, GSA Lease Agreements generally limit all per-year increases to the CPI. *See* Ex. A at DU00298, para. D3 ("Operating Costs Escalator Clause):

> Beginning with the second year of the lease and each year after, GSA shall pay adjusted rent for changes in the costs of cleaning services, supplies, materials, maintenance … [and] *landscaping* … attributable to occupancy. This amount shall be determined by multiplying the total first two year's estimated costs of these items, as negotiated and established prior to the lease award, by the percent of change in the cost of living index from the base figure. The base figure shall be the index figure published for the month prior to the lease commencement date.[2]

In fact, all increases in "operational costs" are to be covered within this formula.[3] *Id.* Ultimately, the GSA operating cost payments only increase by the annual percentage increase in the CPI, regardless of what a subcontractor like Brickman might bill a property owner like Duke. There was simply no "pass through" of Brickman billings to the federal government – either direct or indirect.[4]

---

Drive in Blue Ash, Ohio and a lease for roughly 7 percent of the rentable office space at a separate office park situated at 9075 Centre Pointe Drive in West Chester, Ohio. *See* Ex. A, B and C, attached hereto.

[2] This language is taken verbatim from the initial GSA Lease Agreement governing the 38 Triangle Park Drive property (covering the period from March 1, 1991 through August 31, 2006). *See* Ex. A at DU00298, para. D3. The same provision (albeit expressed in slightly different verbiage) governs the GSA Lease Agreement for the Centre Pointe property. *See* Ex. C at DU00357 at para.1.15 (b)("Operating Costs Adjustment"). The successor GSA Lease for the Triangle Park property does not contain the CPI escalator clause, but nonetheless limits any increases in operating expenses (including landscaping) to between 4 percent and 5.56 percent, depending upon the year covered by the lease. *See* Ex. B at DU00201; *see also* Ex. B at DU00195 at footnote ("There are no operating escalations, only real estate tax escalations.")

[3] The term "operating costs" expressly includes "landscaping" in the GSA lease agreements. *See* Ex C at DU00357, para. 1.15(a).

[4] The lack of a direct "pass through" of charges from Duke to the federal government is wholly consistent with the other provisions in the applicable leases. For example, the federal government expressly capped its liability for the installation of phone lines and cabling to a sum certain ($9,390.00) under the GSA Lease Agreement for the West Chester office park. Ex. C at DU00323-24. If Duke had failed to provide the lines and materials at this set cost, Duke would have absorbed the excess subcontractor charges. *See also* Ex. B at DU00201, in which more substantive "Tenant Improvement" expenses are listed on a line separate and apart from routine "Operating Costs."

It should come as no surprise that Plaintiff-Relator was unaware of this dispositive provision. He has now admitted under oath that he had not reviewed the GSA Lease Agreements prior to filing his Complaint. Elliott Depo. at 248. In fact, he gave a long, rambling answer before conceding that he could not recall having *ever* seen these documents. *Id*. at 246-48. It is also noteworthy that only *one* of the GSA Leases – the 2006 recital for the Triangle Park property – was signed during his time as a Brickman employee. *See* Ex. B, p. DU00194. Plaintiff-Relator also admitted that he had never seen any Brickman invoices to Duke prior to filing his Complaint. *Id.* at 283. He likewise conceded that he has never seen any of the payments received by Duke from the GSA for the subject properties. *Id*. at 151-52. He even acknowledged that all rental payments made by the GSA for the subject properties are paid to Duke, not to Brickman. *Id.* at 26.

By his own admission, Plaintiff-Relator's direct involvement in the billing process was limited to inputting labor and materials estimates into Brickman's COINS software. *Id*. at 141. He also acknowledged, however, that these estimates were never directly incorporated into the terms of either the GSA Lease Agreements or the Duke-Brickman Master Contract. *Id.* at 191 ("The COINS estimate is not a bill."). Under such circumstances, he could not have conceivably possessed the "personal knowledge" of improper billing practices required by the FCA in order to state a claim. It is little wonder, then, that the Department of Justice saw no merit in his allegations.

Moreover, the landscaping costs that Plaintiff-Relator cites as the crux of his claims constitute a tiny fraction of Duke's corporate leases and of the GSA's lease payments. For instance, with respect to one of the Duke properties at issue, the office park situated at 9075 Centre Pointe Drive in West Chester, Duke leases a total of approximately 120,756 square feet to

various individual business tenants. *See* Ex. C at DU00345, para. 12. Of that square footage, only 9,349 square feet – or 7.74 percent of the total space[5] – are leased to the federal government through a standard GSA lease. *Id.* With respect to that specific GSA lease, the GSA agreed at the start of that lease to pay Duke (not Brickman) monthly rent at the rate of $20.72 per square foot, for a total rent payment of approximately $193,616.71 per year. *Id*. at DU00337. This amount goes down to $17.88 per square foot (and $167,017.09 per year) at the beginning of the fifth year of the ten-year lease agreement. *Id.*

The GSA's share of its operating costs associated with that lease are summarized on the page Bates-numbered DU00386. As noted therein, the GSA's payment to Duke of its share of the corporate park's landscaping costs on an annual basis was approximately $1,971 per year. Plaintiff-Relator has admitted that less than 50 percent of this total amount is covered by the allegations set forth in his Complaint.[6] And, as noted in the GSA leases above, any increases in this amount – the less than 50 percent of $1,971 – would be based on the Consumer Price Index, not on any charges assessed by Brickman to Duke.

Thus, Brickman's bills were never submitted to the federal government, Brickman's billing practices were irrelevant to the CPI-based increases set forth in the GSA's leases with Duke, and Brickman is entitled to summary judgment on Count One of Plaintiff-Relator's Complaint.

---

[5] The current GSA-leased space in the Triangle Park property is even smaller – 4.27 percent of the total square footage. *See* Ex. B at DU00199 at para. 14.

[6] During his deposition, Plaintiff-Relator stated that grass-cutting services accounted for more than 50 percent of the $1,971 annual landscaping charge, and that "[t]here's nothing that I'm contesting that Brickman did illegal or wrong cutting the grass." *Id*. at 166 and 267. In fact, he expressly acknowledged the *de minimis* nature of his claims, saying he would push forward "[w]hether it's one dollar or its a million dollars." *Id.* at 203. He also backed away from the allegation in his Complaint that "4,000 hours" of Brickman landscaping services were improperly billed by admitting that this allegation referenced all of the Duke properties in the entire Cincinnati region, not just the handful of federal tenants located within those properties. *Id*. at 190-91.

> **B.**     **Brickman Is Entitled To Summary Judgment In Its Favor On Count Two of Plaintiff-Relator's Complaint Because Plaintiff-Relator Did Not Engage In Any Protected Activity Before He Resigned.**

It is well-established that, in order to succeed on a *qui tam r*etaliation claim, the purported "whistleblower" must establish that: (1) he was engaged in a protected activity; (2) his employer knew he was engaged in a protected activity; and (3) his employer discharged or discriminated against him because of his engagement in the protected activity. *McKenzie v. BellSouth Telecommunications, Inc.,* 219 F.3d 508, 514 (6th Cir. 2000); *see also* 31 U.S.C. § 3730(h). The "protected activity" must relate to efforts to stop or expose fraud upon the federal government, and there must be a causal connection between the relator's efforts to stop or expose the fraud and the discharge from or discrimination in his employment. *U.S. ex rel. Karvelas v. Melrose-Wakefield Hospital,* 360 F.3d 220, 239-240 (1st Cir. 2004); *U.S. ex rel. Smith v. Yale University,* 415 F. Supp.2d 58, 106-108 (D. Conn. 2006). A relator's general dissatisfaction with how he was treated by his employer is insufficient to trigger liability for *qui tam* retaliation. *U.S. ex rel. Judd v. Maloy,* 2006 WL 2583318, *9 (S.D. Ohio Sept. 6, 2006) (citing *U.S. ex rel. Yesudian v. Howard University,* 153 F.3d 731 (D.C. Cir. 1998)). Similarly, allegations concerning non-governmental entities (including private businesses) have no place in a *qui tam* action of any kind, much less a retaliation claim.

Hence, in the case at bar, Plaintiff-Relator must not only be engaged in efforts to stop or expose fraud upon the federal government, he must also explicitly put Brickman on notice that he was "either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir. 2003). Plaintiff-Relator's mere investigation of Brickman's alleged non-compliance with its contractual obligations to Duke constitutes an insufficient basis to impose liability for *qui tam*

8

retaliation. *U.S. ex rel Judd v. Maloy,* 2006 WL 2583318, *9 (S.D. Ohio Sept. 6, 2006) (citing *U.S. ex rel. Yesudian v. Howard University,* 153 F.3d 731 (D.C. Cir. 1998)).

Here, Plaintiff-Relator's claim for *qui tam* retaliation fails because his actions did not rise to the level of "protected activity." He also failed to put Brickman on notice that his purported concerns involved potential *qui tam* liability. Plaintiff-Relator only complained of his general concerns about Brickman's billing practices toward a non-government client. He did not identify individual false claims or bills or their intentional service upon the federal government. He did not resign or cease his work for Brickman. Indeed, Plaintiff-Relator merely performed his ordinary duties as an employee (and supervisor) by revealing his general concerns to Brickman. Such conduct does not constitute "protected activity."[7] *Yuhasz v. Brush Wellman, Inc.,* 341 F.3d 559, 567 (6th Cir. 2003).

This conclusion is supported by Plaintiff-Relator's own deposition testimony. Despite being aware of the alleged over-billing of Duke for several years during his employment, Plaintiff-Relator did not report Brickman to the GSA, local police, FBI, or any other law enforcement agency until after he had both resigned and hired a lawyer.[8] Elliott Depo. at p. 67-68. In fact, he *never* contacted the GSA – the very entity he now claims to have been defrauded by Brickman. *Id*. at p. 67.

---

[7] The context in which Plaintiff-Relator claimed the dubious mantle of "whistleblower" must also be considered. Plaintiff-Relator previously had been disciplined for creating a "hostile work environment" for a female Brickman employee during his tenure with the company. *Id*. at 106-07. He also admitted that he clashed with Brickman management over his request to make a hardship withdrawal from his 401(k) fund. *Id*. at 99-100. Of course, Plaintiff-Relator also left out of his Complaint the fact that he had been engaged in previous litigation with Duke over a workplace injury. *Id*. at 15-16. The record is replete with axes ready for grinding.

[8] While Plaintiff-Relator colorfully claimed at his deposition that he didn't "give a rat's ass about financial incentive," Elliott Depo. at 65, he did admit that he repeatedly mentioned the term "$1.5 million" when discussing his resignation with Brickman's President in a telephone conversation that Plaintiff-Relator surreptitiously recorded. *Id*. at 298-99.

9

In addition, Plaintiff-Relator acknowledged at his deposition his own words that he wrote in his 2005-2006 "self evaluation": "I feel extremely comfortable with [Brickman's] financial reporting." *Id*. at 116-17. Plaintiff-Relator authored this statement, by his own account, during the height of the so-called "fraud" perpetrated by Brickman employees. Plaintiff-Relator also admitted that he personally entered the allegedly "fraudulent" estimates into the COINS estimating system throughout his employment with Brickman. *Id*. at 287.

All of this may explain why, after years of purported fury at "illegal" Brickman billing practices, he made only one passing and obscure reference to the federal government in his resignation letter. *Id.* at 291.[9] Instead, he spends most of the letter attacking his former manager, a man with whom he had a great deal of personal enmity. *Id.* Plaintiff-Relator admits that he continued working for Brickman another *six years* after discovering the alleged fraud – and that he only raised concerns about potential *qui tam* violations *after* he had resigned and obtained counsel. *Id*. at 115-117. This is not the kind of behavior one expects from a true *qui tam* whistleblower.

For these reasons – and the highly compelling fact that Plaintiff-Relator has failed to state an underlying *qui tam* claim – Brickman is entitled to summary judgment in its favor on Plaintiff-Relator's *qui tam* retaliation claim.

---

[9] While the resignation letter does note instances in which COINS estimates allegedly were "manipulated" to "benefit the bottom line," it contains no direct reference to the FCA or any kind of fraud upon the federal government. The only language which could be remotely construed as such is the following: "I will be making an official deposition with federal law enforcement agencies to make sure that my integrity and personal security is documented." In context, however, it is impossible to read this remark as a direct reference to *qui tam* "protected activity," as it is unclear that Plaintiff-Relator even knew that federal tenants were installed at any properties serviced by Brickman. *See* Plaintiff-Relator's Letter of Resignation, dated January 21, 2011 and attached hereto as Exhibit E. Moreover, this remark occurred at the time of Plaintiff-Relator's resignation, and therefore could not be the basis for any retaliation during his employment.

### C. Plaintiff-Relator's *Qui Tam* Retaliation Claim Also Fails Because Plaintiff Resigned and Was Not Subject To Any Adverse Employment Action.

In his Amended Complaint, Plaintiff-Relator claims that he resigned from Brickman in January 20, 2010 "under duress," and that his resignation constituted the adverse employment action separately required to state a claim under the *qui tam* retaliation statute. *See* Complaint at ¶48*; see also Yuhasz*, 341 F.3d at 566; *Marlar*, 525 F.3d at 449. His deposition testimony, however, belies this claim. He admits that he became aware of Brickman's allegedly fraudulent activities "weeks" into his employment – as early as 2004. Elliott Depo. at 61. Despite this purported "discovery," he continued as an active Brickman employee for another six years, all the while accepting promotions and increasing levels of responsibility (and pay) within the company. *Id.* at 290-92. As noted above, he even admitted playing a significant role in the entry of data into the COINS system and praised the company's financial reporting in his 2005-2006 self-evaluation. *Id*. at 287, 116-17. Based upon his own resignation letter – which only vaguely and unintelligibly alludes to alleged billing misconduct – Plaintiff-Relator in fact resigned after his relationship with his immediate supervisor deteriorated and a requested reassignment (within the purportedly fraudulent company) was not immediately provided. Complaint at ¶¶ 46-48; Ex. E at p. 1, para. 2.

Thus, even reading the record in favor of Plaintiff-Realtor at every turn – and assuming that he had engaged in "protected activity" – there is absolutely no evidence that he was ever subject to an adverse employment action by Brickman. He was not demoted, he was not terminated and he has adduced no facts that could be construed to constitute constructive termination – save, of course, for his self-serving claim that he could not participate in the allegedly "fraudulent" Brickman billing he had "discovered" six years prior. What the record *does* show is a man who detested his direct supervisor, and who was upset because he did not

11

receive an immediate transfer into a different department – within the same purportedly "fraudulent" company.  As this Court has previously noted, Plaintiff-Relator "barely" pled facts sufficient to survive on a Rule 12(b)(6) dismissal on this claim. Opinion and Order, Doc. # 20, at p. 29.  Now, on these undisputed facts, it is clear that Plaintiff-Relator cannot sustain a claim for *qui tam* retaliation set forth in 31 U.S.C. § 3730(h), and he certainly cannot recover damages on that basis.

**V.     CONCLUSION**

The subject GSA Lease Agreements provide no basis for any "pass through" billing of landscaping services from Brickman to the federal government, regardless of whether such services were "marked up" or properly billed to Duke.  Thus, the GSA Lease Agreements nullify all of Plaintiff-Relator's legal claims and factual suppositions.  Accordingly, Brickman is entitled to summary judgment as a matter of law on Plaintiff-Relator's claims.

Defendant respectfully requests that the Court grant oral argument on this Motion.

Respectfully submitted,

| | |
|---|---|
| OF COUNSEL: | /s/ Steven P. Goodin |
| | Steven P. Goodin (0071713) |
| | Katherine M. Lasher (0070702) |
| GRAYDON HEAD & RITCHEY LLP | *Attorneys for Defendant* |
| Fifth Third Center | GRAYDON HEAD & RITCHEY LLP |
| Walnut Street | 1900 Fifth Third Center |
| Cincinnati, OH  45202-3157 | 511 Walnut Street |
| Phone: (513) 621-6464 | Cincinnati, OH  45202-3157 |
| Fax:    (513) 651-3836 | Direct:513-629-2845 |
| | Fax:(513) 651-3836 |
| | Sender E-Mail:sgoodin@graydon.com |

**CERTIFICATE OF SERVICE**

     I hereby certify that on January 10, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven P. Goodin
Steven P. Goodin

4004085.1